UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DORETHA WALKER ET AL                    CIVIL ACTION

VERSUS                                  NO: 08-4606

AMID/METRO PARTNERSHIP, LLC             SECTION: J(4)
ET AL

## ORDER AND REASONS

Before the Court is Plaintiffs' **Motion to Remand** (Rec. Doc. 14), seeking a remand to the Civil District Court for the Parish of Orleans and costs, fees, and expenses associated with the allegedly improper removal of the case by defendant MWH Americas, Inc.'s ("MWH"). Defendant AMID/METRO Partnership ("AMID/Metro") has filed a reply memorandum in support of Plaintiffs' Motion to Remand (Rec. Doc. 27).

## PROCEDURAL HISTORY AND BACKGROUND FACTS

Plaintiffs in this case are owners of property in the area of New Orleans East that has been utilized for operation of the Gentilly Landfill, a construction and demolition landfill ("Type III Landfill") that received large amounts of debris in the wake of Hurricane Katrina.

The Gentilly Landfill project was initiated in early 2002, when the City of New Orleans ("the City") and AMID/Metro entered into a contract to acquire the necessary permits and eventually operate a construction/demolition landfill at the former site of

the Old Gentilly Landfill, where the City had dumped municipal waste between the 1960's and 1980's and which had been closed and remediated by the Louisiana Department of Environmental Quality ("LDEQ").  In return for its work in gaining the permit, AMID/Metro would receive 97% of the revenues of the landfill.  As such, AMID/Metro and Metroplex Industries, Inc. filed for and received a Type III Landfill permit on behalf of the City in December of 2004.  Despite the fact that the landfill was permitted, it did not begin to accept waste until after Hurricane Katrina due to certain unmet preconditions of the permit. However, on September 29, 2005, the LDEQ issued an emergency order allowing the Gentilly Landfill to accept Katrina debris. The Gentilly Landfill has generated as much as $40 million in revenues after Katrina, but none of the defendants in this case has offered any compensation or explanation to the plaintiff landowners for their use of the plaintiffs' land.

In 2001, prior to the City's partnership with AMID/Metro, MWH wrote a Request for Proposal issued by the City seeking proposals to build, permit, and operate the Gentilly Landfill. Further, MWH consulted with the City regarding the site of the Gentilly Landfill as early as the 1990's.  As a result, plaintiffs' have alleged that MWH was or should have been aware of the private ownership of the landfill site during the consulting process.

2

Plaintiffs initially named only the City, AMID/Metro, and several other defendants in their state court petition, but later amended to add MWH among others.  MWH removed the case to this Court on October 7, 2008, and is the only defendant who has sought removal under 28 U.S.C. §1442(a), commonly known as the federal officer removal statute.

## THE PARTIES' ARGUMENTS

Plaintiffs argue generally that statutory removal must be construed strictly in favor of remand.  Acuna v. Brown & Root, Inc., 200 F.3d 335, 339 (5th Cir. 2000).  Plaintiffs also cite this Court's decision in Sheppard v. Northrop Grumman Corp., which lays out the four required showings for federal officer removal:  (1) the defendant is a "person" under the statute; (2) that the defendant acted under the direction of a federal officer; (3) a causal nexus between plaintiffs' claims and defendant's actions taken under color of federal office; and (4) a colorable federal defense.  2007 WL 1550992, *5 (E.D. La. 2007) (citing Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 398 (5th Cir.1998) & Mesa v. California, 489 U.S. 121, 124-25 (1989)).  Under this standard, Plaintiffs contend that MWH has provided no actual facts to support that any of its actions were taken pursuant to federal direction as required for federal officer removal.  Therefore, Plaintiffs argue that MWH has not

met the "acting under" and "causal nexus" showings required for removal pursuant to the federal officer removal statute under Fifth Circuit law.

In addition, Plaintiffs contend that MWH has not raised any viable federal defense.  Plaintiffs note further that the allegations of MWH's involvement in the Gentilly Landfill project significantly predate the events of Hurricane Katrina, and thus predate any substantial federal direction under which MWH might seek removal.  Further, to the extent that MWH has alleged federal involvement with its role in the Gentilly Landfill project, Plaintiffs note that MWH has produced no contract, regulation, or any other written direction that required MWH or the City to use the landfill for Katrina debris.  Thus, Plaintiffs contend that MWH cannot utilize the federal contractor defense as a possible federal defense for removal purposes. Finally, to the extent that MWH has asserted immunity under the Stafford Act as a possible federal defense, Plaintiffs cite N&K, Inc. v. Steighner Crane Service for the proposition that "[n]othing in the plain language of the Stafford Act provides that immunity should be extended to non-federal actors."  2008 WL 4412229 (E.D. La. 2008).

Finally, Plaintiffs seek costs, expenses, and fees associated with MWH's allegedly improper removal of this action.

In opposition, MWH relies chiefly on the Supreme Court's

4

recent decision in <u>Watson v. Phillip Morris Companies, Inc.</u> to suggest that this Court's decision in <u>Sheppard</u>, decided three weeks prior to <u>Watson</u>, is no longer controlling in terms of the appropriate standard for §1442(a) removal.  127 S.Ct. 2301, 2307 (2007).  Also, MWH cites the Second Circuit's decision in <u>In Re World Trade Center Disaster Site Litigation</u> for the proposition that Stafford Act immunity may in fact extend to non-federal entities in the context of federally orchestrated large-scale disaster response.  521 F.3d 169 (2d Cir. 2008).  Furthermore, MWH challenges Plaintiffs' contention that removal jurisdiction must be narrowly construed and asserts that removal under §1442(a) must be construed broadly in order to serve the statute's purpose of protecting federal actors entitled to federal defenses.  See <u>Joseph v. Fluor Corp.</u>, 513 F. Supp. 2d 664, 671 (E.D. La. 2007).

Furthermore, MWH notes that Plaintiffs' claims are expressly based solely on *post-Katrina* events.  As such, MWH alleges that the unprecedented federal response and involvement in the post-disaster clean-up of New Orleans rendered the operation of the Gentilly Landfill an essentially federal endeavor.  Therefore, based on the allegedly pervasive presence of the federal government, specifically the Corps of Engineers and FEMA, in the operation of the Gentilly Landfill, MWH and other defendants are entitled to remove under the federal officer removal statute.

In support of this position, MWH cites the statement of
Major General Don T. Riley[1] as well as an EPA Memorandum and
Congressional reports that all suggest that the Corps of
Engineers and/or FEMA were substantially responsible for the
activities at the Gentilly Landfill after Hurricane Katrina.
Specifically, while MWH concedes that the Congressional Research
Service Report ("CRSR") concerning post-Katrina federal debris
response[2] indicates that FEMA officials relied on local officials
to identify properly permitted landfill sites, the CRSR actually
reveals that the Gentilly Landfill was pressed into service by
federal entities.  MWH notes that Plaintiffs themselves admit
that the Gentilly Landfill, although permitted, was not actually
operable at the time of Hurricane Katrina due to unmet
preconditions of the LDEQ.  As such, MWH contends that the
federal response to Katrina forced the landfill into operation,
such that itself and other defendants in this case were acting
under federal direction when the events at issue in this
occurred.  In plain terms, MWH asserts that while the federal
government may not have actually forced state and local actors to

_____

[1]  Department of the Army, Complete Statement of Major
General Don T. Riley, Director of Civil Works, U.S. Army Corps of
Engineers, before the Environment and Public Works Committee,
United State Senate, July 27, 2006, Rec. Doc. 22-2.

[2]  "Disaster Debris Removal After Hurricane Katrina: Status
and Associated Issues." Attachment 2, April 2, 2008. Rec. Doc.
22-2.

allow dumping at the Gentilly Landfill, those state and local officials knew that without their cooperation, they would risk losing unprecedented amounts of federal disaster relief funds. MWH also cites an EPA memorandum prepared for the Corps of Engineers in order for the Corps to minimize possible federal Superfund Liability due to the Corps' extensive involvement at the Gentilly Landfill.  MWH contends that this memorandum is proof that the Corps was intimately involved with the operations at the landfill, and thus federal officer removal was appropriate.

Based on these facts, MWH claims that the federal role in selecting and operating the Gentilly Landfill as a debris site was pervasive, and as such the defendants' conduct in assisting the federal mission allows those defendants to claim Stafford Act immunity, thus validating MWH's removal under §1442(a). Furthermore, MWH notes that this Court's decision in <u>Sheppard</u> resulted in remand based on the defendant's failure to establish any action taken under direction of a federal officer and asserted only actions taken under "general auspices" of a federal officer.  <u>Sheppard</u>, 2007 WL 1550992 at *6.  However, MWH asserts that the intervening <u>Watson</u> decision of the United States Supreme Court altered the jurisprudence that supported this Court's decision in <u>Sheppard</u>.  Specifically, MWH argues that the <u>Watson</u> decision changes the focus of §1442(a) removal from the

intrusiveness of the federal regulation and instead considers whether the private actor participated in "an effort to *assist,* or to help *carry out*, the duties or tasks of the federal superior."  <u>Watson</u>, 127 S.Ct. at 2307 (italics in original). Based on this more broad-based inquiry espoused in <u>Watson</u>, MWH asserts that its removal was proper under the "acting under" and "causal nexus" prongs required for federal officer removal.

To meet the fourth requirement of §1442(a), MWH argues that it has a colorable federal defense under the Stafford Act's "discretionary function" immunity based on the Second Circuit's decision in <u>In Re World Trade Center Disaster</u>.  MWH cites the following language in support of its Stafford Act defense claims: "[if] a federal agency . . . orders a . . . City agency to implement decisions made by the federal agency, in its discretion, we think that 'the interests of the United States will be directly affected' if the . . . City agency does not follow these orders for fear of liability." 521 F.3d at 197.  MWH admits that the <u>In Re World Trade Center</u> decision did not concern issues of removal jurisdiction[3], and also notes that the Second Circuit eventually denied the defendants' summary judgment on the issue of Stafford Act immunity.  Nonetheless, MWH asserts that the <u>In Re World Trade Center</u> decision lends doctrinal support to

---

[3]   The <u>In Re World Trade Center</u> case was a federal question case due to the federal statute granting jurisdiction over 9/11 claims to the federal courts in New York.

the Stafford Act immunity defense, which in turn lends support to
the validity of MWH's removal under §1442(a) in this action.

Finally, MWH argues that the facts of this case are
crucially different than those at issue in <u>Coa v. Wilson</u>, in
which this Court remanded the case after the defendant's attempt
at removal under §1442(a) due to the lack of any evidence as to
whether the defendant was a federal employee.  2007 WL 4234097,
*3 (E.D. La. 2007).  MWH contends that under <u>Watson</u> and the
"acting under" test for §1442(a) removal, there is adequate
evidence of the Corps' and FEMA's overarching role in the post-
Katrina debris cleanup.  MWH asserts that further discovery will
bear out the fact that a federal hand guided the post-Katrina
debris mission.

In response and in support of Plaintiffs' motion to remand,
defendant AMID/Metro opposes MWH's removal arguments by noting
that the LDEQ alone decided to open and operate the Gentilly
Landfill for purposes of debris cleanup.  AMID/Metro points to an
LDEQ Order of September 29, 2005 authorizing use of the Gentilly
Landfill but also expanding the definition of "construction and
demolition" debris for landfills throughout the affected region.
AMID/Metro therefore contends that the Corps and FEMA, while
ultimately approving the City's accepted landfill as appropriate
for debris removal, had nothing at all to do with the LDEQ's and
the City's selection and permitting of the Gentilly site.

9

Likewise, AMID/Metro points to the same CRSR cited by MWH for the proposition that, while federal agencies obviously played a significant role in the debris removal process, no federal entity had any ultimate say in the selection, permitting, and operation of the Gentilly Landfill. Rather, the entire process of establishing and operating the Gentilly Landfill was more a cooperative effort among federal, state, and local authorities, not a federally marshaled and mandated endeavor. AMID/Metro further notes that MWH has not offered any affidavits, contracts, or other official documents to show that FEMA or the Corps directed or controlled the permitting and selection of the Gentilly Landfill. Furthermore, AMID/Metro contends that even under the updated Watson standard for §1442(a) removal, MWH did not in any way assist a federal superior in carrying out a federal duty by submitting to federal direction, guidance, or control. AMID/Metro asserts that MWH acted together with only the City when it assisted in the permitting process for the Gentilly Landfill. Further, only the City and the LDEQ were responsible for the permitting and selection of the Gentilly Landfill as a possible site for the federal debris mission. As a result, AMID/Metro contends that MWH cannot meet the "acting under" requirement for federal officer removal.

Relatedly, AMID/Metro also argues that the allegations in Plaintiffs' petition against MWH concern *pre-Katrina actions*.

Thus, it is indisputable that MWH has not met the "causal nexus" prong of federal officer removal because even if its later actions were somehow federally guided, its actions related to Plaintiffs' claims were not and could not have been pursuant to federal direction.

Finally, AMID/Metro points to several post-Katrina decisions that have denied federal officer removal for lack of sufficient federal direction based on situations in which state agencies merely cooperated with and were not under the direction of any federal entity.  See <u>Preston v. Tenet Healthsystem Mem'l Med. Ctr.</u>, 463 F. Supp. 2d 583, 586 (E.D. La. 2006); <u>Vucinovich v. Chalmette Med. Ctr., Inc.</u>, 2007 WL 2710830 (E.D. La. 2007).

In addition to its initial arguments, MHW has filed a sur-reply brief that includes recently discovered evidence allegedly supporting its contention that the Gentilly Landfill permitting and selection process was federally guided.  Specifically, MWH cites recent interviews with LDEQ officials that confirm that federal officers guided the LDEQ's decisions regarding selection of the Gentilly site.  This guidance consisted of twice daily meetings for review of the debris mission in which federal officers guided the LDEQ in parameters necessary for enabling the federal debris removal effort to proceed.  Further, MWH notes that AMID/Metro itself has used the phrase "pressed into service" (which MWH also uses and contends is the proper characterization

of these facts) to describe the process by which the Gentilly Landfill was selected for federal debris removal, albeit by the LDEQ.

MWH also criticizes AMID/Metro's reliance on <u>Kaye v. SW Airlines Co.</u>, a case which MWH contends has been abrogated by <u>Watson</u>.  2005 WL 2074327, (N.D. Tex. 2005).  Specifically, MWH asserts that <u>Kaye</u> focused too exclusively on the intrusiveness of federal direction, whereas <u>Watson</u> requires a more broad-based inquiry into whether there was federal direction or guidance intended to assist or delegate a federal mission.

Finally, MWH cites testimony from William Subra of the Louisiana Environmental Action Network ("LEAN"), which was prepared with the help of counsel in this case[4] in connection with a 2005 lawuit in the 19th Judicial District Court that attempted to enjoin dumping in the Gentilly Landfill.  This testimony, which MWH asserts has been implicitly approved by Plaintiffs' counsel in this case, suggests that the hurricane debris program involved "a number of federal agencies [that were] responsible for making decisions that directly impacted . . . disposal locations . . . ."  Furthermore, MWH cites a letter from the Tulane Environmental Law Clinic to AMID/Metro, the Mayor of

---

[4]  Specifically, Mr. Subra's testimony includes the acknowledgment that "special thanks" is owed to Plaintiffs' counsel "for their assistance in preparing this testimony."  Rec. Doc. 28-2, at 7.

the City, and the Corps, that indicates that the Corps "was managing the [Gentilly Landfill] site."  Rec. Doc. 28-2 at 27-28. MWH contends that this additional evidence lends further support to the propriety of its removal, and at the very least merits additional discovery for purposes of determining jurisdiction.

<u>**DISCUSSION**</u>

**A.   Federal Officer Removal - "Acting Under" and "Causal Nexus"**

The federal officer removal statute allows removal of an action filed in state court against "the United States or any agency thereof or any officer (**or any person acting under that officer**) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office." 28 U.S.C. §1442(a) (emphasis added).  Unlike removal under other statutory sections that require strict construction, removal under the federal officer removal statute should be construed broadly in favor of removal in order to protect the interests of federal officers and agents in their duties pursuant to federal authority.  See <u>Joseph v. Fluro Corp.</u>, 513 F. Supp. 2d 664, 671 n.7 (E.D. La. 2007) (citing <u>Watson v. Phillip Morris Cos., Inc.</u>, 127 S.Ct. 2301, 2306 (2007).  "Indeed, the Court must interpret the statute liberally, resolving any factual disputes in favor of federal jurisdiction."  <u>Id</u>. (citing <u>Louisiana v. Sparks</u>, 978 F.2d 226 (5th Cir.1992)).  Nonetheless,

13

it remains "the defendant's burden to establish the existence of federal jurisdiction over the controversy." Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 397 (5th Cir.1998).

The Fifth Circuit requires a fourfold showing to allow removal under §1442(a): (1) that the defendant is a "person" under the statute; (2) that the defendant "acted pursuant to a federal officer's directions"; (3) that the defendant's actions under color of federal office share a "causal nexus" with the plaintiff's claims; and (4) that the defendant has stated a "colorable federal defense" related to its actions and the plaintiffs' claims. Winters, 149 F.3d at 398-402; Cole v. Northrop Grumman Ship Systems, Inc., 2008 WL 2651428 (E.D. La. 2008). The parties in this case do not dispute that MWH qualifies as a "person" for purposes of §1442(a), but do dispute both the facts and the law applicable to the other three factors for federal officer removal.

The main legal contention among the parties concerns the proper standard for analyzing the second "under color of federal office" and third "causal nexus" prongs of §1442(a) removal. The most recent Supreme Court decision concerning these factors is Watson v. Phillip Morris Cos. Inc., a decision that expressly noted that the Eighth Circuit decision under review had itself relied on the Fifth Circuit's Winters opinion. 127 S.Ct. 230, 2304 (2007). The Watson Court initially reaffirmed earlier

14

Supreme Court precedent holding that while the "acting under" language of §1442(a) is broad, it is "not limitless." Id. at 2305.  The Court then went on to construe the word "under" as requiring evidence of "a relationship that involves acting in a certain capacity, considered in relation to one holding a superior position or office." Id. at 2307 (internal quotations and citations omitted).  Furthermore, the Court relied on "precedent and statutory purpose" to require that a private party's "acting under" must necessarily "involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." Id. (emphasis in original).  The Court went on to distinguish Watson, a case in which cigarette companies were claiming federal officer status based on mere compliance with extensive industry regulations, from Winters, a case in which a private contractor helped federal interests by "perform[ing] a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." Id. at 2308.  Further, in response to the defendant's argument that its actions were not mere compliance, but a wholesale delegation of duty by a federal agency, the Court found that there were no documents establishing any formal delegation of duty to the private defendant. Id. at 2310.  The Court noted further that "neither Congress nor federal agencies normally delegate legal authority to private entities without saying that they are doing so." Id.

15

In sum, the Watson decision requires a "relationship [that] typically involves **subjection, guidance, or control**" of a private actor by a federal entity.  Id. at 2307.

Under the Supreme Court's most recent statement on the requirements for federal officer removal in Watson, as well as under Fifth Circuit precedent, MWH has not met its burden under the "acting under" or the "causal nexus" requirements for such removal.  First and foremost, MWH's contention that the Watson decision "places less emphasis on the intrusiveness of federal regulation" than historically required under prior Fifth Circuit jurisprudence is unfounded.  Def. Memo Opp. Remand, 13. While MWH characterizes the Watson "acting under" test as contingent upon whether a private person was "intimately involved in 'an effort to assist, or to help carry out, the duties or tasks of the federal superior,'" this view completely ignores Watson's primary focus, namely that the assistance must be in the context of "subjection, guidance, or control" by a federal superior.  Furthermore, the traditional Fifth Circuit analysis for the "acting under" requirement of §1442(a) removal considers whether "a federal officer [had] **direct** and **detailed control**" over the actions performed by the private defendant.  Preston v. Tenet Healthsystem Mem. Med. Ctr. 463 F. Supp. 2d 583, 590 (E.D. La. 2006) (Fallon, J.) (emphasis added); see also Winters, 149 F.3d 387, 399-400; Joseph v. Fluor Corp., 513 F. Supp. 2d 664,

16

672 (E.D. La. 2007) (Fallon, J.); <u>Vucinovich. Chalmette Med. Ctr. Inc.</u>, 2007 WL 2710830, *2 (E.D. La. 2007) (Fallon, J.); <u>City of Petal, Miss. v. Ashbritt, Inc.</u>, 2008 WL 4372758, *2 (S.D. Miss. 2008).  Thus, the traditional Fifth Circuit "direct and detailed control" inquiry is consistent with the <u>Watson</u> Court's focus on "subjection, guidance, or control" of a federal superior. Furthermore, the fact that <u>Watson</u> cited <u>Winters</u> approvingly suggests that the Supreme Court approved of the "direct and detailed control" analysis espoused by the Fifth Circuit.  See <u>Watson</u>, 127 S.Ct. At 2308.  As a result, <u>Watson</u> has not altered the existing "direct and detailed control" analysis under Fifth Circuit law for federal officer removal.

Additionally, as a matter of law, <u>Watson</u> suggests that §1442(a) removal is appropriate, as it was in <u>Winters</u>, when a private entity performs a job that "in the absence of a private firm, the Government itself would have had to perform."  <u>Id</u>. at 2308.  In this case, neither MWH nor any of the other named defendants were performing any job that either FEMA or the Corps would have had to otherwise perform.  In fact, MWH's actions at issue in this case were performed long before Hurricane Katrina and long before any federal intervention into the Gentilly Landfill operations.  The named defendants in this case were involved in selecting, permitting, and operating the Gentilly Landfill, responsibilities which the federal government did not,

17

and in fact *could not perform* because they lie specifically within the power of the LDEQ and municipal governments.  Thus, under <u>Watson</u>, because FEMA and the Corps would not and in fact could not have performed the job, with respect to choosing and permitting the Gentilly Landfill site, that the defendants in this case performed, §1442(a) removal is improper.

Second, the facts of this case do not reveal any "subjection" or "control" by FEMA or the Corps over MWH or any of the other defendants.  First of all, it should be noted that all of alleged actions performed by MWH with respect to the permitting of the Gentilly Landfill *occurred years before Hurricane Katrina*.  Thus, MWH's actions could not in any way have been directed or controlled by federal superiors, because *there was no federal involvement* in the project prior to Hurricane Katrina.

Furthermore, even to the extent that post-Katrina events may be applicable to MWH in terms of its right to federal officer removal, the current record is devoid of any evidence supporting MWH's position.  As noted by Plaintiffs and AMID/Metro, MWH has not supplied any contract, affidavit, or any other similar official document indicating that either FEMA or the Corps exercised any significant control over the selection and permitting of the Gentilly Landfill for Katrina debris removal. Furthermore, to the extent that FEMA and the Corps may have

18

supplied some "guidance" as contemplated by <u>Watson</u> in the operation of the Gentilly Landfill, that guidance did not amount to "direct and detailed control" over the selection, permitting, or even the day-to-day operations of the site.  The very documents that MWH has cited in support of its removal belie the lack of direct and detailed federal control over the establishment of the Gentilly Landfill.

The first of these documents is the Complete Statement of Major General Don T. Riley, Director of Civil Works for the Corps, which MWH cites for the general description of the "extensive federal role in the management of the debris mission." Def. Memo Opp. Remand, 7.  However, Major General Riley's report is replete with statements indicating *cooperation* among federal, state, and local representatives throughout the Katrain debris removal process.  Furthermore, Major General Riley's statement that "the Corps . . . performed unprecedented debris operations" after Hurricane Katrina does not in any way indicate direct and detailed control by a federal superior over the various entities involved in the Gentilly Landfill project.  In fact, immediately after this statement regarding the Corps' performance in the debris mission, he goes on to discuss the vast network of cooperation that facilitated the project:

> Additionally, the Corps developed debris working groups, **comprised of Federal, state, and local representatives**, to provide a basis for daily input to debris planning and execution.  **Representatives from the Corps, the**

19

> **contractors, FEMA, Environmental Protection Agency,
> Occupational Safety and Health Administration, Centers
> for Disease Control, and [LDEQ]** provided various field
> oversight roles as well as providing feedback to the
> working group on a daily basis concerning needs, status,
> and communications.

Rec. Doc. 22-2, Attachment 1 at 4. Finally, MWH's repeated
invocation of Major General Riley's statements referring to "the
**unprecedented** amount of debris resulting from the effects of
Katrina" and his observation that "every [disaster] event is
different" does not in any way relate to the required "acting
under" showing for §1442(a) removal. Thus, while Major General
Riley's testimony suggests cooperation between local, state,
private, and federal entities, it does not in any way prove
direct and detailed control by a federal superior over those
local and state entities.

Next, MWH cites the CRSR presented to Congress on April 2,
2008. Specifically, MWH points to Table A-2, entitled Summary of
Selected Governmental Roles in Post-Katrina Debris Removal
Activities. See Rec. Doc. 22-2, Attachment 2 at CRS-20. While
this table indicates that FEMA was charged with "mission
assigning" the Corps after state requests, and while it indicates
that the Corps was responsible for procuring contracts and
coordinating landfill sites and final debris disposal, the table
also starkly reveals the inadequacies of MWH's "acting under"
argument. Specifically, the table notes the following regarding

20

the role of "State and local government" in the Katrina response:

> The states help coordinate local government requests for federal assistance and work with FEMA to define the mission. **The Corps coordinates with state representatives regarding operational issues. Local agencies are responsible for providing Rights-of-Entry permits to allow the Corps or its contractors to enter private property for debris removal activities** (within the Corps' authority); **establishing criteria and procedures for classifying different types of debris, selecting disposal methods and approving disposal operations;** condemning properties; providing demolition plans, and **designating the appropriate type of landfill.**
>
> **Each state is conducting debris removal operations** in accordance with declarations of emergency issued by its [state] respective Department of Environmental Quality (DEQ) and in accordance with specific management plans issues after the storm.

Rec. Doc. 22-2, Attachment 2, at CRS-21 (emphasis added).  This description of state and local responsibilities, specifically as it relates to **permitting, rights-of-entry, debris classification, approval of disposal operations,** and **designation of landfill sites**, reveals that there was no "subjection" or "control" by either FEMA or the Corps with respect to the establishment, permitting, and operation of the Gentilly Landfill.  Again, the CRSR table indicates more of a cooperative endeavor between state, local, and federal agencies as opposed to any inferior/superior relationship.  Furthermore, this characterization of the debris mission reveals that there was no direct and detailed control by any federal superior, and that

21

state and local entities themselves took a lead role in the establishment of the Gentilly Landfill.

MWH also references a memorandum written for James W. Stark, Director of FEMA's Louisiana Transitional Recovery Office, from Tonda L. Hadley, Director of the Central Regional Officer for the Department of Homeland Security, regarding the "Congressional Inquiry, Landfill Cost Issues Relating to Disposal of Debris in the City of New Orleans." Rec. Doc. 22-2, Attachment 3 ("DHS Memo"). MWH contends that the DHS Memo, which is primarily concerned with issues surrounding use of the Chef Menteur landfill and not the Gentilly Landfill, shows "the demonstrable truth that the federal government pressed the Gentilly Landfill into service to deal with this unprecedented crisis." Def. Memo Opp. Remand, 9. However, besides the fact that the DHS Memo is almost exclusively concerned with the problems at the Chef Menteur site, there is no specific indication anywhere in the memo of any direct and detailed control by FEMA or the Corps regarding site selection, operations, or permitting of the Gentilly Landfill. Thus, the DHS Memo provides no support whatsoever for MWH's allegation that "the federal government pressed the Gentilly landfill into service."

Next, MWH cites a memorandum from John Connolly, Infrastructure Branch Chief for FEMA, to George Pavlou, Senior

Federal Official for the EPA in New Orleans, regarding the
potential CERCLA/Superfund liability of the federal government as
a result of the Gentilly Landfill operations.  Rec. Doc. 22-3,
Attachment 4 ("Superfund Memo").  As an initial matter, FEMA's
and the Corps' concerns regarding Superfund liability do not
reveal any direct or detailed control by those agencies as
federal superiors over state, local, and private entities.  This
is primarily because CERCLA/Superfund liability is joint, several
and strict, and thus any and all parties involved in a Superfund
event are equally liable, regardless of the level of control or
involvement they may have had in the pollution event.[5]  Thus, the
concerns of FEMA and the Corps with respect to possible CERCLA
liability do not indicate in any way whether and to what extent
they controlled the Gentilly Landfill operations.  Furthermore,
the Superfund Memo itself reveals that the City and private
entities played an important role in the day-to-day operations of
the Gentilly Landfill:

> The procedure for waste inspection are [sic] those of the
> City of New Orleans landfill operations contractor and

---

[5]  See Bart Lounsbury, *Digging out of the Holes We've Made:
Hardrock Mining, Good Samaritans, and the Need for Comprehensive
Action*, 32 Harv. Envtl. L. Rev. 149, 173 (2008) ("The prospect of
CERCLA liability scares people, and with good reason. As
previously discussed, liability under CERCLA is joint, several,
strict, and retroactive and subjects responsible parties to
stringent (and often very costly) cleanup standards. Moreover,
anyone who conducts minimal activity on a contaminated site can
rather easily become a responsible party, including Good
Samaritans.").

> those spelled out by FEMA and Corps of Engineers and
> their contractors. The landfill operator's waste
> inspection procedures are to be found in the Site
> Operations Plan contained in the landfill permit
> application (Site Development Plan) submitted by the City
> of New Orleans engineering consultant that prepared the
> permit design site development plan.

Rec. Doc. 22-3, Attachment 4 at 5. Thus MWH's reliance on the
Superfund Memo as a basis for meeting the "acting under"
requirement of §1442(a) is unfounded.

MWH also cites AMID/Metro's responses to requests by the
LDEQ regarding changes to the Gentilly Landfill intended to
render it suitable for the Hurricane Katrina debris mission.
Curiously, MWH quotes a portion of AMID/Metro's response that
*clearly indicates* state and federal cooperation in the Gentilly
Landfill operations:

> In accordance with the [LDEQ] issued Declaration of
> Emergency and Administrative Order to provide regulatory
> flexibility to address hurricane debris, the purpose of
> this submittal is to provide the LDEQ with written
> notification of the changes that have been made at the
> Gentilly landfill . . . to accomodate the requests of
> **federal and state agencies to handle hurricane debris**.

Rec. Doc. 22-3, Attachment 7 at 1. MWH contends that this
language "speaks directly to the notion that the federal
government effectively ordered the City to make the Gentilly
Landfill available to the Corps' debris mission." Def. Memo Opp.
Remand, 21. However, this statement speaks equally to the notion
that the federal government *and the state of Louisiana* cooperated
with *the City* in enabling the debris operations to begin at the

24

Gentilly Landfill.  Furthermore, and somewhat inexplicably, MWH also quotes the following from the written testimony of Dr. Mike D. McDaniel, Secretary for the LDEQ, submitted to the United States Senate Committee on Environment and Public Works on February 26, 2007:

> The LDEQ has no assigned role in . . . storm debris management.  However, **it does have statutory responsibilities for the regulation of solid waste and protection of the environment and has been engaged extensively with the Corp, the federal agency providing assistance to the state in storm debris cleanup and disposal.**  LDEQ's principal role in the Corps' debris mission has been to **identify suitable sites for handling and disposal of storm debris** and to provide **technical assistance with debris management issues.  Surveillance and enforcement activities related to storm debris management fall under LDEQ's statutory responsibilities**.

Rec. Doc. 22-3, Attachment 9 at 2 (emphasis added).  Although this testimony indicates the Corps' substantial role in some aspects of the Gentilly Landfill operations, it also indicates the substantial *and independent* role played by the LDEQ in the post-hurricane debris mission.  Again, this testimony does not support MWH's "acting under" showing, and actually undermines that showing for federal officer removal purposes by revealing the level of cooperation involved in the Gentilly Landfill site.

MWH's position in this removal is best summed up as follows:

> The [Gentilly Landfill] site was . . . plainly pressed into service, not because an officer of the United States walked up to a state or local official and said, "give me the Gentilly Landfill," but because as federal, state and local officials met to address this staggering emergency, the federal government made its needs known, and state

officials knew that the state's cooperation was key to
accessing almost unimaginable federal funding.

Def. Memo Opp. Remand, 9-10.  This argument ignores the fact,
mentioned earlier, that post-Katrina events have *no relevance
whatsoever* to the pre-Katrina activities of MWH in advising the
city during the permitting process for the Gentilly site.
Furthermore, this argument essentially concedes that there *was no
direct and detailed control by any federal superior*, and merely
posits that there was strong federal *influence* in the genesis of
the Gentilly Landfill after Hurricane Katrina.  Thus, MWH's
argument in and of itself, and even excluding the temporal
problem as well as the glaring documentary inadequacies, is
improper in terms of §1442(a) removal.  Although MWH has
presented several other documents purportedly supporting its
position, those cited by the Court above are adequate grounds for
granting Plaintiffs' motion to remand.

Finally, as indicated earlier, this case is similar to
several other post-<u>Watson</u> cases in this Court that have granted
motions to remand after improper federal officer removals in
similar situations.  For example, in <u>Preston</u>, the removing
defendant, a private acute-care contractor for a New Orleans
hospital, attempted removal under §1442(a) based on affidavits of
the defendant's employees claiming that a federal officer
informed them that the federal government had assumed control of

26

patient evacuations in the wake of Hurricane Katrina.  463 F. Supp. 2d at 588.  However, this alleged "federal officer" was merely a privately employed nurse who also served as the District Regional Coordinator for a healthcare division of the Department of Homeland Security.  <u>Id</u>. at 588-89.  The <u>Preston</u> court held that this "federal officer" was at best a "conduit between the federal government and various hospitals throughout Louisiana through which information flowed," and as such there was no evidence of direct and detailed control by a federal superior. <u>Id</u>. at 589.  Although the involvement of federal actors in this case was more pronounced than in <u>Preston</u>, there is nonetheless a similar lack of direct and detailed control by any federal superior.  Also, just as the alleged federal officer in <u>Preston</u> acted as a mere conduit of information between the federal government and private hospitals, the relationship among the private, state, local, and federal entities in this case was more cooperative than hierarchical.  As such, MWH's is not entitled to removal under §1442(a).

**B.   Federal Officer Removal - "Colorable Federal Defense"**

Although Plaintiff's motion to remand can be granted based on the above analysis, the Court will briefly address MWH's argument regarding derivative Stafford Act immunity as a "colorable federal defense" sufficient to allow removal under §1442(a).  The Stafford Act, codified at 42 U.S.C. §5121 et seq.,

27

was enacted "to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from . . . disasters."  42 U.S.C. §5121.  However, "[t]he Federal Government shall not be liable for any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a Federal agency or an employee of the Federal Government in carrying out the provisions" of the Stafford Act.  Id. at §5148.  Judge Berrigan, relying on the decision of the Southern District of New York in In Re World Trade Center Disaster, has recently noted that "[n]othing in the plain language of the Stafford Act provides that immunity should be extended to non-federal actors."  N & K, Inc. v. Steighner Crane Serv., Inc., 2008 WL 4412229, *2 (E.D. La. 2008).

    MWH argues that Judge Berrigan's decision has been cast into doubt by the Second Circuit's decision in In Re World Trade Center Disaster, in which the court held that "[d]erivative immunity . . . could apply in the Stafford Act context where: (1) the [federal] agency, in its discretion, approved reasonably precise specifications regarding the management of a recovery site; (2) the agency supervised and controlled an entity charged with implementing those specifications; and (3) the entity warned the agency about any dangers known to it but not to the agency."

28

In Re World Trade Center Disaster, 521 F.3d at 198.

MWH's reliance on In Re World Trade Center Disaster is unfounded for several reasons. First, even if Judge Berrigan's decision in Steighner is incorrect and private entities are entitled to derivative Stafford Act immunity, the very requirements enumerated by the Second Circuit to establish such immunity are clearly not met in this case. As discussed at length above, neither FEMA nor the Corps nor any other federal agency provided any specifications, nor controlled the implementation of any such specifications, in the context of the Gentilly Landfill debris mission. In fact, it was state and local entities enforcing their own specifications that led to the choice of the site for debris removal. Furthermore, MWH's involvement in the development of the Gentilly Landfill predated any federal involvement in the site's operations. Thus, even if there were any federally mandated and monitored specifications in the landfill's establishment, they would not have been imposed on MWH.

Finally, and as a matter of procedure, the In Re World Trade Center Disaster case was before the Second Circuit on interlocutory appeal from the Southern District of New York, which had first considered the case under a statutory grant of original and exclusive jurisdiction. 521 F.3d at174 (noting that the case was removed from New York state court to the S.D.N.Y.

based on the grant of original and exclusive jurisdiction in the Air Transportation Safety and System Stabilization Act).  Thus the Second Circuit was dealing purely and squarely with the validity of a derivative Stafford Act immunity defense, and not with the question of whether this clearly questionable defense is a sufficiently "colorable" defense for federal officer removal. Although §1442(a) should be construed broadly to protect the interests of the federal government in completing authorized duties, the plain language of the Stafford Act immunity provisions does not suggest that the immunity extends to private entities.  Thus, despite the possibility left open by the Second Circuit regarding such derivative immunity, MWH has not sufficiently stated a colorable federal defense under the Stafford Act to support removal.

In sum, MWH has not met its burden under §1442(a) to support removal of this case under a theory of federal officer removal. As such, this case should be remanded to the Civil District Court for the Parish of Orleans.

**C.   Sanction for Wrongful Removal**

Plaintiffs have requested that this Court order MWH to pay all costs, expenses, and attorneys' fees associated with the improper removal of this action, ostensibly pursuant to 28 U.S.C. § 1447(c), which states that "[a]n order remanding [a] case may require payment of just costs and any actual expenses, including

attorney's fees, incurred as a result of the removal."

Courts considering fee awards under § 1447(c) invariably take into consideration the defendant's decision to remove, and "the propriety of the defendant's removal continues to be central in determining whether to impose fees." Maranta v. Lee, 3 F.3d 925, 928 (5th Cir. 1993).  Further, while a court "may not review the decision to remand itself, [it] must, as part of [the] examination of the award of fees, consider the objective validity of the removing party's efforts, at the time that party attempted to remove the case." Hornbuckle v. State Farm Lloyds, 385 F.3d 538, 541 (5th Cir. 2004).  Accordingly, "[f]ees should only be awarded if the removing defendant lacked objectively reasonable grounds to believe the removal was legally proper." Id. (internal quotations omitted).

In these circumstances, Plaintiffs' request for fees, costs, and expenses is granted because all of MWH's allegations concerning its right to federal officer removal are based on post-Katrina events, despite the fact that MWH's involvement in the Gentilly Landfill project took place years before the hurricane and the eventual debris mission.  Further, MWH has not supported its federal officer removal petition with any official contracts, affidavits, or other such documents.  The only evidence supporting MWH's removal consists of public record reports and memoranda that do not address any of the specific

requirements for a proper showing under §1442(a).  Thus, the Court finds that MWH lacked objectively reasonable grounds for seeking federal officer removal.  Accordingly,

IT IS ORDERED that Plaintiffs' **Motion to Remand** (Rec. Doc. 14) is hereby **GRANTED.**

IT IS FURTHER ORDERED that this action is **REMANDED** to the Civil District Court for the Parish of Orleans for further appropriate proceedings therein.

IT IS FURTHER ORDERED that Plaintiffs' request for costs, fees, and expenses associated with the present removal proceedings is hereby **GRANTED.**  Counsel for Plaintiffs shall file an appropriate motion for fees and costs, with supporting documentation, within 15 days from the entry of this order. Defendants shall file any opposition within 10 days thereafter. The Court will take the matter of fees and costs under advisement at that time.

New Orleans, Louisiana this 19th day of December, 2008.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE